NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2099
_____


SELVIN JOSUE MARTINEZ-ALMENDARES,
Petitioner

v.

ATTORNEY GENERAL UNITED
STATES OF AMERICA,
Respondent


_____

On Petition for Review of an Order of the Board of Immigration Appeals
(Agency No. A208-542-211)
Immigration Judge: Honorable Silvia A. Arellano

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
April 12, 2018

Before: CHAGARES, VANASKIE, Circuit Judges, and BOLTON, District Judge[*].

(Opinion Filed: May 2, 2018)
_____

OPINION[†]
_____

_____

[*] The Honorable Susan R. Bolton, Senior United States District Judge for the District of Arizona, sitting by designation.

[†] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

CHAGARES, Circuit Judge.

Selvin Martinez-Almendares ("Martinez-Almendares") petitions for review of his order of removal entered by the Board of Immigration Appeals ("BIA"). The BIA affirmed the decision of the Immigration Judge ("IJ") denying Martinez-Almendares' petition for asylum, withholding of removal, and relief under the Convention Against Torture (the "CAT"). We will deny his petition for review.

I.

Because we write solely for the parties, we will only briefly summarize the essential facts. Martinez-Almendares is a native and citizen of Honduras. He is a gay man, although he has largely kept his sexual identity secret. Before he came to the United States, he told only two friends in Honduras, both gay men, about his sexual identity. He knew other gay men who lived openly and were not persecuted for their sexual identities. The only instance he could recall of a gay man being mistreated because of his sexual identity was when a private citizen punched an acquaintance named Arturo after Arturo made an unwelcome advance at a bar. Martinez-Almendares believed that others questioned his sexual identity due to his behavior and mannerisms. He never told his family that he was gay because he thought that, if he did, his family might not accept him and that his father might hit him.

Although Martinez-Almendares testified that he had seen television reports showing gay men who were targeted for violent crimes by gangs, he was not aware of the details of those incidents, nor was he personally aware of any such incidents. He testified

2

he believed the police could not protect gay men because they were unable to protect any Honduran citizens from gang violence.

In August 2015, Martinez-Almendares was working as a clerk at a transportation company when a gang member entered the building, attacked Martinez-Almendares, and stole both his personal property and money from the cash registers. The gang member told Martinez-Almendares that the gang member would kill him if he called the police. Martinez-Almendares filed a police report after the robbery. Later, the gang attempted to extort Martinez-Almendares and his employer. At no point during any of these interactions did any gang member or police officer mention Martinez-Almendares' sexuality.

On October 8, 2015, Martinez-Almendares entered the United States and was taken into custody by Customs and Border Patrol agents. He appeared before an IJ in Elizabeth, New Jersey, who sustained the Department of Homeland Security's charge of removability.

Martinez-Almendares applied for asylum, withholding of removal, and protection under the CAT. The IJ considered testimony from Martinez-Almendares, documentary evidence, and reports on Honduras' treatment of gay people and the country's struggles with violence generally. The IJ held that Martinez-Almendares was not eligible for asylum because, although his sexual identity placed him within a protected social group, he had not established that he was likely to be persecuted on that basis. The IJ considered the August 2015 incident to be "criminal violence motivated by greed," rather than persecution motivated by Martinez-Almendares' sexual identity. Administrative Record

3

("AR") 37. The IJ noted that there was no reason to believe that the gang which carried out the attack would become aware of Martinez-Almendares' sexual identity, and thus no reason to believe it would persecute him based on that identity. In the alternative, the IJ held that Martinez-Almendares had failed to establish he could not avoid persecution by relocating within Honduras, because he had only suffered gang violence in the city where he worked, and had not suffered the same violence in his hometown. The IJ further held that, because Martinez-Almendares had not established eligibility for asylum, he also could not meet the stricter standards for withholding of removal, and that Martinez-Almendares was ineligible for protection under the CAT.

Martinez-Almendares appealed to the BIA, which affirmed. It added to the IJ's analysis by noting that his mother was a close friend with a gay man who had not been persecuted. Martinez-Almendares timely petitioned for review of the BIA's decision.

## II.

In his petition for review, Martinez-Almendares argues that the IJ and BIA erred by determining (1) that he lacked a well-founded fear of future persecution, (2) that his sexuality would not become known, and (3) that he had failed to show he could not reasonably relocate within Honduras. We have jurisdiction to review final orders of removal. 8 U.S.C. § 1252(a).

We exercise de novo review over the BIA's legal determinations. Castillo v. Att'y Gen., 729 F.3d 296, 301–02 (3d Cir. 2013); Valdiviezo-Galdamez v. Att'y Gen., 663 F.3d 582, 590 (3d Cir. 2011); Francois v. Gonzales, 448 F.3d 645, 648 (3d Cir. 2006). The BIA's determinations regarding the likelihood of future persecution are reviewed for

substantial evidence.  See Wang v. Ashcroft, 368 F.3d 347, 349–50 (3d Cir. 2004); Abdille v. Ashcroft, 242 F.3d 477, 483–84 (3d Cir. 2001).  Under this standard, "the BIA's finding[s] must be upheld unless the evidence not only supports a contrary conclusion, but compels it."  Abdille, 242 F.3d at 483–84.

The Attorney General may grant asylum, or withholding of removal, to an alien in removal proceedings who establishes he is a "refugee" under the Immigration and Nationality Act.  8 U.S.C. § 1158(a).  An applicant for asylum bears the burden of proving "that he or she is a refugee as defined by" 8 U.S.C. § 1101(a)(42)(A).  8 C.F.R. § 208.13.  A person may qualify as a refugee if "he or she has suffered past persecution or [if] he or she has a well-founded fear of future persecution."  8 C.F.R. § 208.13(b).  Martinez-Almendares argues only that he has a well-founded fear of future persecution.

To demonstrate a well-founded fear of future persecution, an applicant must prove (1) "a fear of persecution . . . on account of" protected characteristics, such as "race, religion, nationality, membership in a particular social group, or political opinion"; (2) "a reasonable possibility of suffering such persecution if he . . . were to return to that country"; and (3) that he "is unable or unwilling to return to, or avail himself of the protection of, that country because of such fear."  8 C.F.R. § 208.13(b)(2)(i); see Shardar v. Att'y Gen., 503 F.3d 308, 313 (3d Cir. 2007).  Not all treatment that is "unfair, unjust, or even unlawful or unconstitutional" will qualify as persecution, only "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom."  Camara v. Att'y Gen., 580 F.3d 196, 202 (3d Cir. 2009).  An applicant must have a subjective fear of future persecution and that fear must be objectively well-

5

founded.  Valdiviezo-Galdamez v. Att'y Gen., 663 F3d 582, 590–91 (3d Cir. 2011).  The feared acts of persecution must be "committed by the government or forces the government is either unable or unwilling to control."  Abdulrahman v. Ashcroft, 330 F.3d 587, 592 (3d Cir. 2003) (quotation omitted).

Martinez-Almendares is a member of a protected social group because he is a gay man.  An applicant must show that his protected characteristic "will be at least one central reason for persecuting the applicant," should he be removed.  8 U.S.C. § 1158(b)(1)(B)(i).  He must either show "a reasonable possibility that he . . . would be singled out individually for persecution" or that, in his home country, there exists "a pattern or practice . . . of persecution of a group of persons similarly situated" in terms of their protected characteristics.  8 C.F.R. § 1208.13 (b)(2)(iii).  An applicant must also show that he could not "avoid persecution by relocating to another part of the applicant's country . . . if under all the circumstances it would be reasonable to expect the applicant to do so."  8 C.F.R. § 1208.13(b)(2)(ii).

Martinez-Almendares argues that the BIA erred by discounting the evidence of a "pattern or practice of harm against LGBTI Hondurans by both the government and non-government actors that the government cannot or will not control."  Martinez-Almendares Br. 2.  He argues that this evidence shows that gay men are systematically persecuted throughout Honduras, and thus Martinez-Almendares would be subjected to persecution upon removal that he could not avoid by relocating within Honduras.  The IJ and BIA both considered this evidence and both disagreed.  Martinez-Almendares submitted evidence showing that Honduras struggles with violence and corruption and

6

has a history of discrimination against LGBT individuals. His evidence included a troubling statistic that 92% of crimes against LGBT individuals went unsolved due to inadequate investigation, but it did not compare that statistic to the rate at which crimes against the general population were solved or investigated. Other facts showed that Honduras had recently added sexual identity as a protected class under anti-discrimination laws, and that individuals have been convicted for crimes targeting LGBT individuals. Martinez-Almendares testified that although he had seen news reports of crimes committed against gay men by gangs, the gay men he knew faced no persecution even when they lived openly. Thus, the BIA had substantial evidence to conclude Martinez-Almendares had failed to establish that gay men were systematically persecuted throughout Honduras.

Next, Martinez-Almendares argues that the BIA erred by holding his sexual identity was unlikely to be revealed upon a return to Honduras. This, he argues, would impermissibly force him to conceal his identity. See Fatin v. I.N.S., 12 F.3d 1233, 1242 (3d Cir. 1993) ("[W]e will assume for the sake of argument that the concept of persecution is broad enough to include governmental measures that compel an individual to engage in conduct that is not painful or harmful but is abhorrent to that individual's deepest beliefs."). This argument mischaracterizes the BIA's decision, which "did not require [Martinez-Almendares] to conceal his identity." Appendix ("App.") 5. Rather, the BIA concluded that Martinez-Almendares failed to demonstrate that gang members or other persecutors were likely to learn his sexual identity. Without learning his sexual identity, they could not persecute him on that basis. The evidence showed that he was

7

able to keep his sexual identity largely a secret in Honduras and that other gay men lived openly without persecution. Moreover, Martinez-Almendares argued his persecution would take the form of gang violence, and he presented no evidence that gang members would learn of his sexual identity. We need not decide whether an asylum applicant can be forced to hide his sexual identity to avoid persecution, because the BIA here did not do so; it merely concluded that Martinez-Almendares had failed to demonstrate that he was likely to be persecuted on the basis of his sexual identity when he had not shown that his would-be persecutors would know of his sexual identity. It had a substantial factual basis to make this determination.

Finally, Martinez-Almendares argues that the BIA erred by holding that he could reasonably relocate within Honduras by returning to his hometown for two reasons. First, he argues that the BIA failed to consider his fear of his male family members. Martinez-Almendares testified that his father "might hit [him] very hard" if he learned that Martinez-Almendares was gay, AR 357, and that he was worried his family would not "accept the way I am" if they learned he was gay. AR 118. This feared mistreatment by his family, while "unfair" or "unjust," is not sufficiently severe that it would qualify as persecution. Camara, 508 F.3d at 202. Even if he could establish that his father would commit violent acts amounting to either a threat to his life or torture, Martinez-Almendares does not argue that this domestic mistreatment would be committed by the government or by forces the government was unable or unwilling to control. See Abdulrahman, 330 F.3d at 592. In the alternative, Martinez-Almendares produced no

8

evidence showing why he could not relocate to his hometown — where the only gay man he knew lived openly without persecution — but live separately from his father.

Second, Martinez-Almendares argues that the BIA failed to consider his evidence showing that LGBT individuals faced discrimination throughout Honduras such that relocation anywhere in Honduras would not alleviate his well-founded fear of persecution. Martinez-Almendares himself testified he knew openly gay men, including one who lived in his hometown, and that these men were not persecuted for their sexuality except for a single instance of a fistfight with a private citizen in a bar. Although Martinez-Almendares points to troubling evidence showing unjust conditions throughout Honduras, in light of his conflicting testimony we cannot say that the BIA lacked substantial evidence for its determination.

III.

For the foregoing reasons, we will deny the petition for review.